Western New York Water Company v. Commissioner. Utilities & Industries Corporation v. Commissioner.
Western New York Water Co. v. Commissioner
Docket Nos. 89282, 89283
United States Tax Court
T.C. Memo 1964-183; 1964 Tax Ct. Memo LEXIS 159; 23 T.C.M. (CCH) 1090; T.C.M. (RIA) 64183; June 30, 1964
*159 Petitioner, Western New York Water Company, sold all of its properties and assets to the Erie County (New York) Water Authority in a settlement in lieu of condemnation in 1953. Respondent determined that certain items included by said petitioner in its basis for computing gain or loss on the sale were not properly included therein. Held, that petitioner Western has established that its easements, franchises, rights of way, etc., acquired prior to March 1, 1913, had a fair market value on that date; that value determined. Held, also that petitioner Western has failed to establish a March 1, 1913, fair market value for an alleged going-concern value on that date, or that it is entitled to include any amount for such value in its basis for determining gain or loss on the sale of its assets. Robert J. Casey and Thomas J. McCoy, Jr., for the petitioners. John J. O'Toole and Colin C. MacDonald, Jr., for the respondent. HOYT
Memorandum Findings of Fact and Opinion HOYT, Judge: These proceedings have been consolidated. Respondent determined an income tax deficiency against petitioner Western New York Water Company (Docket No. 89282) for the calendar year 1953, in the amount of $1,688,878.90, all of which is in controversy. Petitioner claims an overpayment of $49,030.87 in income tax for the taxable year 1953. Respondent determined that petitioner Utilities & Industries Corporation (Docket No. 89283) is liable for the aforesaid income tax deficiency, constituting its liability as a transferee of the assets of Western New York Water Company, transferor. Such liability is herein conceded to the extent of any deficiency ultimately determined to be due from Western New York Water Company. Petitioner Western New York Water Company assigns the following errors: 1. Respondent *161 erroneously determined that petitioner realized additional capital gain of $6,287,140.31 and ordinary income of $79,273.89 on the sale in 1953, in lieu of condemnation, of all its properties and assets to the Erie County Water Authority. 2. Respondent erroneously disallowed the claimed deduction, from the proceeds of the sale, of the amount of $5,221,150 representing the cost basis as recorded on its books and the March 1, 1913, value of various easements, franchises, etc., acquired prior to that date. 3. Respondent erroneously refused to allow as deductions from the proceeds of the sale, as properly includable in petitioner's basis, (a) the amount of $9,611,633 representing the March 1, 1913, fair market value of petitioner's "going-concern" value, and (b) the amount of $7,075,160 representing the March 1, 1913, fair market value of petitioner's good will. 4. Respondent erroneously disallowed the claimed deductions, from the proceeds of sale, representing amounts properly includable in petitioner's basis as follows: (a) Interest during construction
$316,521.69
(b) Bond Discount and Issue Cost
272,771.15
(c) Engineering and Superintendence
12,035.54
(d) Miscellaneous construction cost
9,006.52
*162 5. Respondent erroneously disallowed the claimed deduction, from the proceeds of sale, of the amount of not less than $50,000 representing fees and transfer expenses incurred in the sale. At the trial and in regard to the first issue, petitioner conceded that there is no issue herein with respect to respondent's determination that it realized additional ordinary income in the amount of $79,273.89 in the taxable year 1953, resulting from respondent's adjustments pertaining to deductions for depreciation and taxes. In regard to issue 3(b) with respect to the alleged March 1, 1913, fair market value of petitioner's good will, no evidence was adduced and that issue is deemed abandoned. In regard to issues 4(a) to (d), inclusive, respondent has conceded in his brief that the above alleged items and amounts, respectively, are properly includable in petitioner's basis and deductible from the proceeds of the sale for determining the gain realized thereon. In its reply brief petitioner accepts that concession notwithstanding a slight variance between the above alleged amounts and certain figures appearing in the stipulation of facts. In regard to issue 5 the parties have stipulated *163 that in connection with the transfer of its properties in the 1953 sale, petitioner incurred expenses in the net amount of $67,294.61 rather than the above alleged $50,000. Further, at the trial, the parties orally stipulated that such transfer expenses in the amount of $67,294.61 are properly includable in petitioner's basis and deductible from the proceeds of the sale for determining the gain realized thereon. At the trial petitioner moved for and received permission from the Court to amend its petition so as to claim an additional deduction for 1953, but on brief petitioner states that the amendment need not and will not be filed. The conceded issues will be given effect in the recomputation under Rule 50. The stipulation of facts filed by the parties and joint exhibits attached thereto are included by this reference and the facts therein contained are found accordingly. Our Findings of Fact will embrace those facts pertinent to the remaining issues involving the alleged March 1, 1913, fair market value of (a) petitioner's easements, franchises, etc., and (b) of petitioner's going-concern value. Findings of Fact Petitioner in Docket No. 89282, Western New York Water Company *164 (hereinafter sometimes referred to as "Western" and/or petitioner), was a New York corporation which was dissolved pursuant to a resolution of its stockholders at a meeting held on October 25, 1956. A certificate of dissolution was filed in the office of the Secretary of State of the State of New York on December 6, 1956. Under the laws of New York, Western remains in existence for the purpose of winding up its affairs, including the prosecution of and defense against claims, and maintains its office for that purpose at 425 park Avenue, New York, New York. On September 15, 1954, Western filed its income tax return for the calendar year 1953, pursuant to extensions of time granted on March 15, 1954, and July 21, 1954, with the then director of internal revenue for the Lower Manhattan District (now the Manhattan District). Upon the dissolution of Western in 1956 most of its assets and liabilities were transferred to New York Water Service Corporation, which owned approximately 98 percent of its outstanding stock. Subsequently the corporate name of the latter-named corporation was changed to Utilities & Industries Corporation, petitioner in Docket No. 89283. Western was incorporated *165 under the laws of the State of New York on February 14, 1902, for the purpose of selling water to the town of cheektowaga, in Erie County, New York. Its authorized capital consisted of 50,000 shares of $100 par value common stock. At all times material herein Western was in the business of supplying water to various customers in Erie County, New York, and as a result of its business was also engaged in the construction of plant and facilities and the acquisition of various easements, franchises, rights of way and other property necessary to enable it to carry on its business. On May 1, 1902, Western authorized the issuance of up to 10 million dollars in 5 percent First Mortgage Bonds, par value $1,000, to be secured by a mortgage on company properties. The Depew & Lancaster Water Works Company was a corporation organized under the laws of the State of New York in November, 1892, for the purpose of selling water in the town of Depew and the town and village of Lancaster in Erie County, New York, from wells located in Lancaster. On November 7, 1900, that company sold its assets and properties to the Depew & Lake Erie Water Company. The Depew & Lake Erie Water Company (hereinafter *166 referred to as "Depew"), was incorporated on May 10, 1900, under the laws of the State of New York with an authorized capital of 6,000 shares of $100 par value common stock. Upon its organization in 1900, Depew issued 5,931 shares of its $100 par value common stock and 40 First Mortgage 5 percent Bonds par $1,000, to its organizers, Cutter, Mingle, and Baker in exchange for the rights of way, contracts, franchises, and options secured by them. In May, 1900, Depew began construction of facilities to furnish water drawn from Lake Erie to customers between Lake Erie and the town of Wende in Erie County, New York. During the years 1900 and 1901 construction was paid for by Depew First Mortgage 5 percent Bonds. In July, 1902, Western purchased all of the outstanding 6,000 shares common stock of Depew by exchanging therefor one of Western's common shares plus $50 cash for each share of Depew. Western obtained the necessary cash by selling its bonds. That same month Western issued 33,491 shares of $100 par value common stock, 187 First Mortgage 5 percent Bonds, par $1,000, and $52,076.46 in cash to F. S. McGraw for property, franchise rights, privileges, and services. McGraw was a former *167 president of Depew and a former director, vice president and general manager of Western. From 1902 to 1909, construction of facilities to furnish water to customers was paid for by Western which issued its bonds in payment. During said period of 1902 to 1909, construction was carried out by the American Pipe & Construction Company which, in addition to cost of construction, plus 15 percent profit margin, was paid stock of Western having an aggregate par value of $1,000,000. On July 23, 1909, Depew was liquidated and all of its properties transferred to petitioner Western. Prior to 1913, Depew and Western acquired various permits, easements, franchises, rights of way, and water-supply agreements, for the purpose of the installation and operation of a water supply system which embraced areas lying south, east, and north of the City of Buffalo, New York. Joint Exhibit 3-C, included herein by reference, is a map showing petitioner Western's 1953 extensive water system and more particularly in colored lines certain primary easements obtained by Depew and Western during each of the years 1900, 1901, and 1902. By 1911 additional easements or rights of way had been acquired. Three primary *168 easements for an indefinite period of time and still in use in the taxable year 1953, were obtained by Depew in 1900 for the purpose of laying intake pipes and trunk water mains from Lake Erie across the Stony Point Land Company property; thence on the Terminal Railway of Buffalo right of way through the town of Hamburg (south of Buffalo) and northeasterly through the towns, West Seneca and Cheektowaga, to the town of Depew and thence on the New York Central and Hudson River Railroad Company right of way easterly from the town of Depew to the town and railroad station of Wende, Erie County, New York; thereby providing a contiguous trunk line easement for approximately 20 miles. In 1901 additional easements were acquired for laying transmission water mains in the town of Hamburg, and the next year in a general northwesterly direction from the town of Depew to the town of Tonawanda (north of Buffalo) covering a distance of some 14 miles, more or less, plus several miles of additional lateral mains to interspersed communities. By 1911 easements or rights of way had been acquired for transmission water mains covering a distance of some 15 miles, more or less, through portions of Hamburg, *169 West Seneca, South Buffalo, and Cheektowaga to the town of Depew. The agreement of May 9, 1900, entered into by Depew and the New York Central and Hudson River Railroad Company (hereinafter sometimes referred to as the "New York Central" or "Railroad") granted to Depew "its successors and assigns, forever, upon condition" that it keep and perform certain covenants, and not otherwise, the right to lay, construct, repair, renew, and maintain trunk water mains in and along the northerly side of the right of way of said Railroad from a designated point in the town of Cheektowaga to the town and railroad station of Wende, New York. Such right was limited to a strip of land 6 feet wide, including the laying and use, etc., of trunk water mains under the railroad tracks and roadway between designated points, but expressly limited to trunk mains and without the right to lay service pipes connecting the said mains upon the railroad property. All work was to be done at the expense and risk of Depew under the "supervision and control" of the railroad's chief engineer and strictly pursuant to all his rules and regulations in order to protect properly the public and the property and traffic of *170 the railroad. Depew agreed to indemnify and save harmless the railroad from all loss, damage and injuries to its property, agents, servants and passengers by reason of doing or failure to repair, renew or maintain said works. The railroad reserved the right to terminate the grant as to any part of the premises required for use or traffic of its line of railroad, and to require Depew to remove its trunk mains, but it was expressly agreed that in such event Depew would be granted the right to construct and use its pipes in and along some other portion of the strip of ground on the sides of the railroad right of way. The railroad reserved the right to terminate the grant in the event of the failure of Depew, its successors and assigns to supply the railroad with water of the quality, in the quantity, and at the prices to be specified in a separate agreement. On May 14, 1900, the same parties entered into an agreement providing for a supply of water to Railroad not exceeding an aggregate of 1,000,000 gallons per day at a rate of 7 cents per 1,000 with a minimum payment by the Railroad of $37.50 per day. That agreement was for a term of 5 years with Railroad having the right to continue *171 it in force upon the same terms and conditions for such period as Railroad desires so long as Depew's pipes remained upon the right of way of the Terminal Railway of Buffalo or of the New York Central. The agreement of May 21, 1900, entered into by Depew and The Terminal Railway of Buffalo granted to Depew the right to lay, construct, and maintain trunk water mains on Terminal's right of way in the towns of Hamburg, West Seneca, and Cheektowaga to the town of Depew. That agreement contained provisions essentially similar to those in the above-mentioned agreement between Depew and the New York Central with respect to the rights granted to and conditions and liabilities imposed upon Depew, the rights and privileges reserved by Terminal Railway and, further, reserved to Terminal the right to terminate the grant in the event Depew failed to supply water to New York Central pursuant to the terms of its above-mentioned agreement with Depew dated May 14, 1900. An agreement of July 21, 1900, entered into by Depew and the Stony Point Land Company recited that the latter owned certain land along the shore of Lake Erie, that prior to its acquisition thereof, Depew had begun proceedings to *172 condemn a certain portion thereof for the purpose of taking water from Lake Erie and, further, that upon execution of the agreement Depew would discontinue its condemnation proceedings. The agreement provided that Stony Point granted to Depew "in perpetuity, the right, easement, and license to lay and maintain intake iron water pipes across and under its land" from the east side thereof to the shore of Lake Erie in a 20-foot wide strip on the north line of the property, the pipes to be so laid that the tops thereof be at least 10 feet below the surface of the ground. The laying, maintenance, repair and any removal and relaying was at the sole cost and expense of Depew and required to be in a manner satisfactory to Stony Point so as not to interfere with the business or operations of the latter, its tenants or grantees. Stony Point reserved to itself, its assigns and grantees the right to lay any railroad tracks or erect any structure upon or over such strip of land and, further, in certain events to require the removal and relocation of the pipes at Depew's cost and expense. Depew agreed to indemnify Stony Point, its assigns or grantees, against all damages resulting from laying, maintaining *173 or repairing its pipe, or, from breakage or leakage and, further, released Stony Point, its assigns and grantees, from all claims for damages to the pipes or property connected therewith. Depew covenanted to supply water at all times to Stony Point, its tenants, assigns, and grantees, upon terms as favorable as to any other customers similarly situated. The agreement further provided that in the event the adjacent waters became navigable and Stony Point's water frontage became available for docks, then Depew agreed to make, at its own expense, all necessary changes in the depth and location of its pipes to avoid any interference with navigation and docks. The record herein does not disclose the character and terms of other easements, rights of way, etc., obtained by Depew and Western prior to March 1, 1913, in connection with the establishment of the latter's water-supply system as of that date. On March 1, 1913, Western had an established operating water--supply system consisting, inter alia, of principal trunk mains laid on railroad rights of way affording easy grade levels and curves, reservoirs, pumping stations, extensive transmission mains to various communities, distribution *174 mains, and service pipes to customers. The trunk lines and other transmission mains were initially constructed for a larger water-carrying capacity than actually needed at the times they were laid so as to provide for future growth of the system without the added expense of laying new pipe. In 1913 Western was pumping 6 million gallons of water per day and by 1928 the pumpage of water was 12.5 million gallons per day through the same transmission system constructed during the years prior to 1913. During the period May 10, 1900 to February 28, 1913, Western and its predecessor, Depew, had net earnings or (losses) as follows: Depew
May 10, 1900 to December 31,
1901
($ 940.04)
1902
( 13,340.61)
1903
( 21,021.95)
1904
( 1,569.27)
1905
3,644.34
1906
31.10
1907
7,159.55
1908
17,555.46
January 1, 1909-July 31,
1909
23,208.44
Western
July 24, 1902-December 31,
1904
($ 1,270.09)
1905
( 2,133.14)
1906
( 2,635.91)
1907
( 3,033.81)
1908
( 2,605.57)
1909
( 75,444.44)
1910
( 8,459.58)
1911
( 28,294.97)
1912
( 85,834.29)
January 1, 1 93-February 28,
1913
( 18,446.36) During that period Western and Depew *175 experienced combined net losses in the total amount of $213,431.14. Such losses were partly due to the additional investment required for the initial construction of trunk line and transmission mains much larger than required to service then existing customers in order to provide adequate facilities for contemplated future growth. The record does not disclose when Western's operations became profitable, nor does it reflect net earnings or losses for years after March 1, 1913. On or about July 27, 1951, the Erie County Water Authority commenced condemnation proceedings in the County Court of Erie County for the acquisition of all of Western's plants and property. Western continued in the business of supplying water until 1953 when a settlement in lieu of condemnation was reached with the Erie County Water Authority under the terms of which all of the assets and properties of Western were turned over to the Authority for a total consideration of $14,780,022.11. When its properties were taken over by the Erie County Water Authority in 1953, Western's books reflected the following items as nondepreciable capital assets: Easements
$5,221,150.00
Interest during construction
316,521.69
Bond Discount and Issue Cost
272,771.15
Engineering and Superintendence
12,035.54
Miscellaneous Construction Cost
9,006.52
*176 For Federal income tax purposes, Western reported a gain of $653,755.63 on the sale of its properties and assets to the Erie County Water Authority, in the computation of which, Western deducted, inter alia, from the proceeds of the sale and as includable in its basis for determining gain or loss, the items and amounts shown in the next preceding paragraph. In the statutory notice, respondent adjusted Western's basis by eliminating, inter alia, those same items and amounts. On its tax return, no amount of "going-concern" value was included by Western in its basis for determining gain on the sale, nor does the record reflect that any portion of the consideration paid by Erie County Water Authority was paid for "going-concern" value. In connection with its Federal income tax return for the calendar year 1953, petitioner Western reported a gain. Western elected to postpone the payment of tax due on the gain pursuant to the provisions of section 112(f) of the Internal Revenue Code of 1939. Western's final return for 1953 showed a net loss of $19,671.36 and petitioner claimed a refund of $108,000 previously paid with a tentative return. This amount was refunded on May 18, 1955. Upon *177 audit of Western's return, certain adjustments not involved herein were made and petitioner paid $49,030.87 to the then district director of internal revenue for the Lower Manhattan District on April 24, 1957. Findings of Ultimate Facts The easements, franchises, rights of way, etc., which petitioner Western acquired prior to March 1, 1913, for its water distribution system and which were still in use and embraced in its properties and assets sold in the taxable year 1953, had a March 1, 1913, fair market value in the amount of $3,500,000. Petitioner Western has failed to establish a March 1, 1913, fair market value for its alleged "going-concern" value on that date. Opinion The stipulations and concessions of the parties at the trial and on briefs have left two remaining issues involved in these proceedings. As presented to the Court, those issues embrace solely questions of fact regarding the amount, if any, of the fair market value, as of March 1, 1913, of Western's easements, franchises, etc., and of its alleged "going-concern" value. Our conclusions based upon the entire record, are hereinabove set forth. For Federal income tax purposes of reporting gain or loss on *178 the involuntary sale, in lieu of condemnation, of all its properties and assets in 1953, Western included in its claimed basis, inter alia, the amount of $5,221,150 as representing the cost basis reflected on its books for easements, franchises, etc. In his statutory notice of the deficiency in controversy, respondent disallowed such claim in toto and in effect thereby assigned a zero basis for those assets. In its petition herein, Western alleged that the cost of its easements and franchises and also their fair market value as of March 1, 1913, was $5,221,150. At the trial no effort was made to prove the historical cost as reflected on Western's books because the primary records thereof prior to 1913, are no longer available. Petitioner contends that it has met its burden of proof by evidence produced in the form of stipulated facts, exhibits, and the uncontradicted testimony of a well qualified expert witness; that such evidence establishes Western's acquisition of easements, franchises, rights of way, etc., prior to 1913 and more particularly the primary easements for laying trunk lines and other transmission mains which at all times constituted the backbone of its water distribution *179 system; and that such evidence establishes a fair market value of $3,500,000, as of March 1, 1913, for all of its easements, franchises, rights of way, etc., acquired prior to that date and embraced in its properties and assets sold in 1953. Further, petitioner contends that it is entitled to include in its basis for the purpose of determining gain or loss on the sale in 1953, the March 1, 1913 fair market value for easements, etc., pursuant to section 113(a)(14) of the Internal Revenue Code of 1939. [1]
*180 Respondent offered no evidence of value, but was content to rest upon cross-examination of petitioner's expert witness, and, on brief, to argue failure of proof. Respondent does not question the qualification of the witness and his testimony and expert opinion remain unshaken in any material respect. Petitioner's witness with respect to the value of the easements, etc., was well qualified as an engineer with many years of experience in appraising various types of properties, including those of public water utilities, located in various parts of the country. He was thoroughly apprised of the factual circumstances surrounding Western's easements, franchises, etc., and the physical aspects of its water system employing the use of those easements, as they existed during the years prior to and on March 1, 1913. He testified specifically as to the various physical and engineering factors taken into consideration in arriving at his expert opinion of the fair market value as of March 1, 1913. He testified especially as to the factors relating to the primary easements, which consisted of a whole bundle of rights and obligations for an indefinite period of years for the laying and maintenance *181 of the water intake pipes and the principal trunk water mains on the railroad rights of way but his valuation was for all of Western's easements, franchises, rights of way, etc., as they existed on March 1, 1913. In our judgment, based upon the entire record, the facts of record give sound basis for petitioner's expert testimony as to the March 1, 1913, easements and the value fixed by the witness is fair and reasonable in amount. An early case, Anita M. Baldwin, 10 B.T.A. 1198, 1201 (1928), expressed the opinion that: * * * We are thus confronted with a record in which not merely the preponderance but all of the evidence of value supports petitioner's contention. It would seem to be a reasonable proposition that if the evidence adduced by one party in support of a proposed valuation is clear, convincing and uncontradicted and no reason for disbelieving or discounting such evidence is present, and if the adverse party neither weakens the testimony by cross-examination nor produces any evidence on his own behalf, the party producing the evidence should prevail. In Maine Steel, Inc. v. United States, 174 F. Supp. 702 (D.C. Me., 1959), the second issue *182 presented a question of the fair market value of buildings, machinery and equipment as to which there was uncontradicted testimony of qualified expert witnesses on behalf of the taxpayer plaintiff, while the Government introduced no evidence and relied only on cross-examination. The Court stated that in view of such showing, "the assignment by the Commissioner of a zero valuation to these assets is patently absurd" and quoted with approval the above-cited language in the Baldwin case, supra, and added that the "Court cannot reject such evidence and make an arbitrary finding of value unsupported by evidence" and, further, found for the plaintiff in the amounts claimed. In Alvary v. United States, 302 F. 2d 790 (C.A. 2, 1962), where there was expert testimony on both sides that confiscated buildings had some market value at the time of gifts to the taxpayer and no evidence that the properties were valueless, it was held that the trial judge erred in finding that there was no market value because of certain economic and political conditions obtaining at the time of the gifts. The Court stated: *183 Fair market value is defined by the regulations as "the price at which * * * property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell." Treasury Regs. 108, § 86.19(a); now Treas. Reg. § 25.2512-1. During an abnormal period, such as depression, war, or political turmoil, when there are few or no willing buyers, fair market value is, at best, an elusive concept. But the small number of willing buyers does not preclude a finding that property has some fair market value. There is a difference between value and liquidity; that no buyers are presently accessible does not make the fair market value zero. * * * A trial judge cannot arbitrarily disregard all the expert testimony in the record and rely upon his unsubstantiated personal beliefs instead of upon evidence. We are persuaded by the expert testimony on this issue and conclude and have made a finding that Western's easements, franchises, rights of way, etc., acquired prior to March 1, 1913, had a fair market value of $3,500,000 on that date. Accordingly, Western is entitled to include such amount in its basis for determining gain on *184 the 1953 sale. In this respect respondent erred in his determination. Effect thereto will be given in the redetermination under Rule 50. Petitioner's assignment of error 3(a) presents the question of whether petitioner is entitled to include in its basis an amount representing the March 1, 1913, fair market value of the "going-concern" value of its business. While no claim for this item was included in petitioner's tax return for the year 1953, the issue has been raised by the petition, and respondent denies error with respect thereto. On brief the petitioner requests us to make ultimate findings that Western's business had an intangible going-concern value as of March 1, 1913, in the amount of $6,698,503, or, in the respective alternative amounts of $5,557,250; $2,217,201; and $1,075,948. Those amounts reflect inclusion of various factors, all or at least some of which, petitioner contends should be considered in determining going-concern value. The opinions and conclusions of an expert witness who testified to various aspects bearing on this issue are the basis for petitioner's claim. Respondent offered no evidence on this issue, but contends that petitioner has failed to establish *185 that Western's business had any going-concern value, as of March 1, 1913. Pointing out that petitioner's only evidence of going-concern value as of that date is the one opinion based on capitalization of past losses and the deficiency in a fair return on investment, respondent argues that the losses evidence an increasing trend and cannot be converted by an expert's formula into a corporate asset to increase basis, and that petitioner has failed to carry its burden of proof of the value by its suggested theoretical computation. Petitioner's position rests upon several premises, namely, that it is not unusual for a new water company to experience losses in early years of operation due to a large additional investment in overbuilding the size of facilities for future growth without obtaining an immediate adequate return thereon; that during a period of years, including 1913, there was a recognized principle that early year's losses of a utility could be capitalized in determining the appropriate rate base used in charges for services; that a reasonable rate of return for a water company in years prior to and including 1913 was 10 percent per annum on its total investment; and that *186 the deficiency of return on investment plus early losses before depreciation plus unearned depreciation, is a proper and recognized method of determining the intangible going-concern value of a water company or other utility on a given date. The parties have stipulated the net earnings or losses of Western and Depew during the period from May 10, 1900 to February 28, 1913, and we have set them forth in detail in our Findings of Fact. As shown there the losses totaled $213,431.14 for those years. The petitioner introduced no evidence of net earnings or losses in the years immediately following this period. The other figures used in arriving at the various alternative amounts of alleged going-concern value, rest upon estimates, computations and conclusions of the expert witness testifying on this issue, without satisfactory proof of the basic figures used in his computations. Petitioner relies upon the testimony of that witness to establish the amount of Western's investment in physical depreciable property as of March 1, 1913, and the deficiency in return on its investment in such property plus land owned in fee, the amount of depreciation sustained in years prior to March 1, 1913, and *187 the amount of bond interest paid in years prior to March 1, 1913. Further, petitioner relies upon the conclusion of its witness that the total of the deficiency in return plus early losses plus unearned depreciation of Western and Depew from May 10, 1900 to March 1, 1913, amounted to $2,217,201 as representing the gross going-concern value and after deducting therefrom bond interest in the sum of $1,141,253 resulted in the amount of $1,075,948 as representing the net going-concern value based only on the investment in depreciable property plus land owned in fee (exclusive of easements and franchises which that witness did not consider). Petitioner contends that the investment of Depew and Western in easements and franchises acquired for stock and bonds, was at least equivalent to their fair market value as of March 1, 1913, and, further, that the deficiency in return (at a 10 percent rate) on such investment amounted to a total of $4,481,302 from May 10, 1900 to March 1, 1913, which should be included in the amount of going-concern value. With respect to the alternative amounts of alleged going-concern value, claimed herein, the $6,698,503 figure represents the result of the computation *188 based on alleged investment in depreciable properties, land owned in fee, and easements without deducting bond interest, and the $5,557,250 figure is the result after deducting such interest. The $2,217,201 and $1,075,948 figures are the respective gross and net going-concern values testified to by the expert witness, as above mentioned. Assuming without deciding that petitioner is entitled to add a March 1, 1913, going-concern value to its basis for determining gain or loss forty years later when its water works were sold to Erie County Water Authority, we cannot agree with either the method used by petitioner to arrive at such value or the conclusions of its expert witness. Petitioner's argument is summed up on brief as follows: If the entire business had been sold as of that date [March 1, 1913], its fair market value would have been determined on appraisal by adding to the value of its physical properties, the amount of the losses, deficiency in return, and unearned depreciation that it had experienced during its construction and development period prior to 1913. We have already pointed out in discussing the first issue that fair market value is the price at which property *189 would change hands at a given time between willing buyer and seller. Cf. Alvary v. United States, supra. If the question here were to ascertain the going-concern value at the time of petitioner's acquisition by Erie in 1953, we would be guided by the principles announced in Kimball Laundry Co. v. United States, 338 U.S. 1 (1948). We feel that the same criteria should be applied to a determination of 1913 going-concern value if such is to be included in and allowed as part of basis in determining gain or loss on subsequent sale. Under Kimball going-concern value is established by evidence that "would have been likely to convince a potential purchaser as to the presence and amount of petitioner's going-concern value * * *" in 1913. We do not have evidence in this record of petitioner's pre-1913 earnings, nor did petitioner's expert witness have same in reaching his conclusions. We do know that petitioner had suffered net losses from 1902 to 1913 aggregating $213,431.14 for those years. Petitioner insists that going-concern value can be assigned and computed where there are earnings and that no net profit need be shown; also that the loss situation disclosed *190 by this record was only temporary. We have already pointed out that the record is devoid of evidence as to when net profits were realized by petitioner nor can we determine whether or not such loss picture was temporary or of long duration. Kimball, supra, clearly states that there are additional or substitute methods for determining going-concern value other than capitalization of "net income," and that although not capitalized and carried on its books going-concern value may be present "even in a business losing money or at any rate not making enough to have any 'excess' income." Kimball v. United States, supra, at pp. 18 and 19. To this extent Kimball gives petitioner support. However, we cannot conclude that it, or any authority to which we have been referred, would justify the method of computation adopted by petitioner's expert and urged upon us. Kimball likewise supports respondent's claim here that petitioner must lose the issue because of its failure to carry its burden of proof. In discussing this aspect of the case, the decision in Kimball states as follows (pp. 19-20): But even though evidence in one or more of these categories may tend *191 to establish the value of petitioner's trade routes, the consequence of its inadequacy may require complete denial of compensation where that would not be the result in the case of its tangible property. The reason is this: evidence which is needed only to fix the amount of the value of the tangible property is required to establish the very existence of an intangible value as well as its amount. Since land and buildings are assumed to have some transferable value, when a claimant for just compensation for their taking proves that he was their owner, that proof is ipso facto proof that he is entitled to some compensation. The claimant of compensation for an intangible, on the other hand, who cannot demonstrate a value that a purchaser would pay for has failed to sustain his burden of proving that he is entitled to any compensation whatever. This is a burden, moreover, which must be sustained by solid evidence; only thus can the probability of future demand be shown to approximate that for tangible property. On this issue we agree with respondent's contentions, and particularly with the argument that the expert's basic fact assumptions find no support in this record. There is no *192 evidence of cost of or investment in depreciable properties, land or easements, and likewise we do not know the March 1, 1913, value of these tangible properties save for the easements alone. Petitioner has failed to produce clear and convincing evidence in support of any of the proposed alternative valuations of the alleged going-concern value of Western's business and the rule announced in the Baldwin case, supra, and other above-cited authorities, has no application to the situation obtaining on this issue, as contended by petitioner. Although we are inclined to agree with respondent's argument that adding together a string of any years' losses and then capitalizing them without ever showing when, if ever, profits began to be realized is a doubtful means of proving going-concern value, we need not express any opinion as to the validity of petitioner's proposed method of determining such value here. We hold that petitioner has failed to establish the March 1, 1913, fair market value of its water company's alleged "going-concern" value as of that date. Decisions will be entered under Rule 50. Footnotes
1. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * *
(14) Property Acquired Before March 1, 1913. - In the case of property acquired before March 1, 1913, if the basis otherwise determined under this subsection, adjusted (for the period prior to March 1, 1913) as provided in subsection (b), is less than the fair market value of the property as of March 1, 1913, then the basis for determining gain shall be such fair market value. In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date.↩